IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| WALTER-EL ALKEMET SHAKUR EL-BEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO. 3:14-CV-47-WKW |
| | ) | (WO) |
| ALFONZA MENEFEE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Before the court is the amended motion for summary judgment (Doc. 47) filed by

Defendant Tuskegee University.  Having considered the motion, the court concludes that it

is due to be granted.  Further, the court concludes that all claims against Tuskegee University

are due to be dismissed with prejudice, and that Tuskegee University is due to be dismissed

from this action.

**I.  Standard of Review**

**A.     Summary Judgment**

"Summary judgment is appropriate 'if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show there is no

genuine [dispute[1]] as to any material fact and that the moving party is entitled to judgment

as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th

---

[1]Effective December 1, 2010, the language of Rule 56(a) was amended. The word "dispute" replaced the word "issue" to "better reflect [ ] the focus of a summary-judgment determination." Fed. R. Civ. P. 56(a), Advisory Committee Notes, 2010 Amendments.

Cir. 2007) (per curiam) (citation omitted); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence which would be admissible at trial indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–324.

Once the movant meets his evidentiary burden and demonstrates the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Celotex*, 477 U.S. at 324; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also* Fed. R. Civ. P. 56(c) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not

2

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

To survive the movant's properly supported motion for summary judgment, a party is required to produce "sufficient [favorable] evidence" "that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Id.* at 249–250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576–1577 (11th Cir. 1990) (quoting *Anderson*, *supra*). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Hence, when a nonmoving party fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to its case and on which the nonmovant will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other

facts immaterial.").

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. 5800 SW 74th Ave.*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co, Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine dispute of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323–324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine dispute as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (to establish a genuine

4

dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor).  However, if there is a conflict in the evidence, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *Ruiz de Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine issue of material fact. *Beard v. Banks*, 548 U .S. 521, 529 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.

**B.     28 U.S.C. § 1915(e)(2)(B)(ii): Failure to State a Claim Upon Which Relief Can be Granted**

When, as here, a litigant is allowed to proceed *in forma pauperis* in this court, the court will screen the litigant's complaint in accordance with the provisions of 28 U.S.C. § 1915(e)(2)(B).  Section  1915(e)(2)  requires a district court to dismiss the complaint of a party proceeding *in forma pauperis* "at any time" if court determines that the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary damages from a defendant who is immune from such relief.  28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

The same standard that governs a dismissal under Federal Rule of Civil Procedure

12(b)(6) also governs the evaluation of a complaint for failure to state a claim upon which relief can be granted under 28 U.S.C. §1915(e)(2)(B)(ii). *Douglas v. Yates*, 535 F.3d 1316, 1320 (11th Cir. 2008) (applying the standard governing dismissal under Rule 12(b)(6) to review of a *pro se* complaint under 28 U.S.C. § 1915(e)(2)(B)(ii)). Under this standard, although the court must accept well-pled facts as true, the court is not required to accept a plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). In evaluating the sufficiency of a plaintiff's pleadings, the court must indulge reasonable inferences in plaintiff's favor, "but we are not required to draw plaintiff's inference." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005). Similarly, "unwarranted deductions of fact" in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations. *Id.*; *see also Iqbal*, 556 U.S. at 681 (stating conclusory allegations are "not entitled to be assumed true").

A complaint may be dismissed if the facts as pled do not state a claim for relief that is plausible on its face. *See Iqbal*, 556 U.S, at 679 (explaining "only a complaint that states a plausible claim for relief survives a motion to dismiss"); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561-62, 570 (2007) (retiring the prior "unless it appears beyond doubt that the plaintiff can prove no set of facts" standard). In *Twombly*, the Supreme Court emphasized that a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Factual allegations

in a complaint need not be detailed but "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (internal citations and emphasis omitted).

In *Iqbal*, the Supreme Court reiterated that although Fed. R. Civ. P. 8 does not require detailed factual allegations, it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A complaint must state a plausible claim for relief, and "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss. *Id.* at 679. The well-pled allegations must nudge the claim "across the line from conceivable to plausible." *Twombly*, 556 U.S. at 570.

## II.    Procedural History

On January 21, 2014, Walter-EL Alkemet Shakur EL-Bey (also known as Walter Earl Topps (Doc. 40-1 p. 36)) filed a *pro se* complaint against Macon County Probate Judge Alfonza Menefee, Tuskegee University, and acting Tuskegee University Provost Walter Hill. Upon review of the complaint pursuant to the court's duties under 28 U.S.C. § 1915(e)(2)(B),[2] and after holding a status conference on February 28, 2014 to determine if EL-Bey could state a claim against any of the defendants, the court determined that the

---

[2]EL-Bey is proceeding *in forma pauperis*.  (Doc. 7).

claims against Walter Hill were due to be dismissed.  (Doc. 8; Doc. 9).

On June 6, 2014, Tuskegee University filed a motion for summary judgment.  (Doc. 25).  On June 23, 2014, the court ordered EL-Bey to file an amended complaint consisting of "a short, plain statement in which the Plaintiff shall describe with reasonable particularity the nature of the allegedly unconstitutional actions that . . . Defendant Tuskegee University took toward him on June 18, 2013."[3]  (Doc. 30).  Following a status conference on July 23, 2014, the court granted leave to Tuskegee University to amend its summary judgment motion after the filing of the amended complaint.  (Doc. 38).

On August 1, 2014, EL-Bey filed an amended complaint.  (Doc. 40).  In his amended complaint, EL-Bey alleges the following against Tuskegee University:

1.   On 13 June 2013 on the orders of Barbara Chisholm and Walter Hill, two Tuskegee University campus police officers (Lieutenant Edwards and unknown) did grab and forcefully lift Mr. EL-Bey from a seated position and slam him to the ground and apply handcuffs upon Mr. EL-Bey while conducting business in the Tuskegee University Bursar's office under the color of authority. At this time and to date Tuskegee University was indebted to Mr. EL-Bay the amount of $5,493.

2.   On 13 June 2013 Peter Spears did conspire with Walter Hill and Chief Martis to initiate a trespassing order for Mr. EL-Bey. Chief Martis did not comply stating, "I do not want to interfere with your education process."

3.   On 17 June 2013 Tuskegee University did charge Mr. EL-Bey with

_____

[3]In his original complaint, EL-Bey alleged that he was subjected to false arrest in the Tuskegee University Bursar's office on "approximately 18 June 2013." (Doc. 1-1 p. 1).  In his amended complaint, EL-Bey alleges that the arrest occurred on "13 June 2013." (Doc. 40 p. 3).  Tuskegee University has presented evidence that the arrest occurred on June 13, 2013.  (Doc. 49-2 p. 2 ¶ 6).  Accordingly, it is now undisputed that EL-Bey was arrested in the Bursar's office on June 13, 2013, not on June 18, 2013.

Defiance of Authority and Conduct Inappropriate for a Tuskegee University Student, and forced him under threat and coercion to sign a form obligating him complete 30hrs of community service on the university campus as well as complete a psychiatric program.

4.    On 23 October 2014 Tuskegee University's Peter Spears and Walter Hill did conspire with the Alabama Law Enforcement Tactical System (LETS) and Alabama Bureau of Investigation (ABI) to initiate an alert on Mr. EL-Bey and his automobile.

5.    During the time of the complaints set forth and into the present Mr. EL-Bey is a student at Tuskegee University involved in a dispute process over grades and perceived harassment and discrimination by the University and its professors, faculty, and staff due to his physical appearance and religious/spiritual beliefs. On many occasions Mr. EL-Bey was asked if he was a Christian and/or if he believed in god as if it were an integral part of the academic process.

(Doc. 40 p. 3 ¶¶ 1-5) (sic).

On August 21, 2014, Tuskegee University filed an amended motion for summary judgment (Doc. 47) to which EL-Bey has responded[4] (Doc. 52). Accordingly, the motion for

---

[4]On October 10, 2014, one month after the expiration of the deadline for him to respond to Tuskegee University's motion for summary judgment (*see* Doc. 30), EL-Bey submitted an additional unsigned and unsworn document (Doc. 54) in opposition to the motion for summary judgment. EL-Bey had been advised of the requirement that opposition to summary judgment must be based on evidence and may not rely on unsworn statements or pleadings. (Doc. 28); Fed. R. Civ. P. 56(c). He had also been advised that "failure to file sworn affidavits may result in this court accepting the moving party's evidence as the truth." (Doc. 28). However, EL-Bey's untimely submission is not a sworn affidavit or declaration. *See* Fed. R. Civ. P 56(c); 28 U.S.C. § 1746. Because the document filed by EL-Bey is simply an unsworn (and unsigned) brief, the court cannot consider the factual averments of the document as evidence for purposes of the motion for summary judgment. *See* Fed. R. Civ. P 56(c); *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (quoting *Holloman v. Jacksonville Hous. Auth.*, 2007 WL 245555 (11th Cir. 2007) (unpublished opinion), quoting in turn *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir. 1980) ("'[U]nsworn statements, even from *pro se* parties, should not be "consider[ed] in determining the propriety of summary judgment."'"); *Gordon*, 622 F.2d at 123 ("Although *pro se* litigants are not held to the same standards of compliance with formal or technical pleading rules applied to attorneys, we have never allowed such litigants to oppose summary judgments by the use of unsworn materials."); *see also Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).

summary judgment is now under submission.

### III.    Facts

EL-Bey is a graduate student in the Tuskegee University College of Agriculture, Environment and Nutrition Sciences.  (Doc. 49-2 pp. 6-7 ¶ 3).  On June 12, 2013, EL-Bey went to the Bursar's office and requested a check for a financial aid refund.  (Doc. 49-2 p. 1 ¶ 2).  The Bursar, Barbara Chisolm,[5] informed EL-Bey that a refund had been allocated to his account.  (Doc. 49-2 p. 1 ¶ 2).  The following day, June 13, 2014, EL-Bey returned to the Bursar's office and demanded that he receive the refund immediately.  (Doc. 49-2 p. 1 ¶ 4). Student refund checks are typically generated by the accounts payable department within 14 days after the refund registers on their account, but Chisolm submitted a request to expedite the payment to EL-Bey.  (Doc. 49-2 p. 2 ¶¶ 5-6).  Chisolm informed EL-Bey that the check would not be available immediately and that he could not wait in the Bursar's office for the refund check because the Bursar's office does not disburse the checks in its office; checks are either mailed to the student or disbursed via direct deposit.  (Doc. 49-2 ¶¶ 7, 16).

EL-Bey was not satisfied with Chisolm's attempt to expedite the payment.  (Doc. 49-2 p. 2 ¶ 7).  Several times, Chisolm asked him to leave the office, but he refused, insisting that he would not leave the office until he received the refund check.  (Doc. 49-2 p. 2 ¶¶ 7, 9). After Chisolm asked EL-Bey to leave several times without success, she called campus

---

[5]Both Tuskegee University and EL-Bey spell the Bursar's last name as "Chisholm."  However, in her sworn affidavit, the Bursar spells her last name as "Chisolm" and signed the affidavit using that spelling. (Doc. 49-2 pp. 1-4).  Therefore, the court will use the spelling that the Bursar uses for her own name in her affidavit.

police.  (Doc. 49-2 p. 2  ¶ 9).

Campus police arrived and three times asked EL-Bey to leave.  (Doc. 49-2 p. 2 ¶ 10).

He refused.  (Doc. 49-2 p. 2  ¶ 11).  The police then attempted to remove EL-Bey from the

office, and he physically resisted.  (Doc. 49-2 p. 2 ¶ ¶ 13-14).  EL-Bey alleges that he was

removed from his seat, handcuffed, and "slammed to the ground" during the incident.  (Doc.

40 ¶ 1).  He also alleges that Tuskegee University officials sought to "initiate a trespassing

order" against him, but the Tuskegee University Police Chief did not comply because he was

concerned that criminal charges would interfere with EL-Bey's education.  (Doc. 40 p. 3 ¶

2).

Later in the day on June 13, 1013, Chisolm personally hand-delivered a refund check

to EL-Bey at the campus police department.  (Doc. 49-2 p. 3 ¶ 22).

On June 14, 2013, Tuskegee University brought student disciplinary charges against

EL-Bey for the following two violations of the student handbook: defiance of authority (for

refusing Chisolm's instructions to leave the Bursar's office) and conduct inappropriate for

a Tuskegee University student (for "[d]emanding a financial aide [sic] refund check, refusing

to leave the premises when told to and becoming belligerent when officers arrived").  (Doc.

40-1 p. 8; Doc. 49-2 p. 35).  On June 17, 2013, EL-Bey entered a plea of guilty to "all

accussed [sic]" charges (Doc. 49-2 p. 34); he was sanctioned with probation and required to

complete community service and mental health counseling.  (Doc. 49-2 p. 36).  Although it

is not material here, the court notes that EL-Bey now alleges that unspecified "threat[s] and

coercion" "forced" him to sign the guilty plea.  (Doc. 40 p. 3 ¶ 3).

## IV.   Discussion

**A.   42 U.S.C. § 1981: Interference With Contractual Rights**

42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens.

42 U.S.C. § 1981(a),(c).

Section 1981 protects against discrimination on the basis of race, ancestry, or ethnicity, but not on the basis of religious belief or national origin.  *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987) ("If respondent on remand can prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981.").  EL-Bey cites § 1981 in his complaint, and in his response to Tuskegee University's summary judgment motion, EL-Bey submits a sworn statement that he was "persecuted [by Tuskegee University] due to his ethnic identity. . . either real or perceived." (Doc. 40 p. 1; Doc. 52 p. 3).  Therefore, the court will construe the complaint as asserting a claim pursuant to § 1981 that, on the basis of EL-Bey's "real or perceived" ethnicity, Tuskegee University interfered with his sit-in strategy to obtain an on-the-spot refund.  *See* Fed. Rule Civ. Proc. 8(e) ("All pleadings must be construed so as to do justice"); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed,'

and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

To establish a cause of action for contractual interference under § 1981, EL-Bey must show (1) that he is a member of a racial or ethnic minority; (2) that Tuskegee University intentionally discriminated on the basis of EL-Bey's race or ethnicity; and (3) that the discrimination prevented EL-Bey from exercising the right to make, enforce, or terminate a contract on the same terms as any other student. *See Al-Khazraji*, 481 U.S. at 613; *Lopez v. Target Corp.*, 676 F.3d 1230, 1233, 1235 (11th Cir. 2012).

It is not clear from the evidence or the allegations of the *pro se* complaint whether EL-Bey's attempt to obtain a refund on June 13, 2013 was an attempt to enforce a contract by demanding his refund on-the-spot in the Bursar's office. However, Barbara Chisolm, the Tuskegee University Bursar, submitted a sworn affidavit, uncontroverted by any other evidence,[6] which establishes that (1) no students of any race, religion, or national origin were

---

[6]On numerous occasions, including at the February 28, 2014 status conference, EL-Bey has been informed that he must state specific *facts* that demonstrate that the alleged wrongs committed by the Defendants were the result of discriminatory animus. (*See* Doc. 28). EL-Bey has entirely failed to do so with respect to the incident in the Bursar's office. The court acknowledges EL-Bey's sworn statement that he was generally "persecuted due to his ethnic identity . . . either real or perceived" (Doc. 52 p. 3). However, this is not a statement of fact demonstrating racial animus on the part of Tuskegee University during the incident at the Bursar's office, but a statement of EL-Bey's subjective belief and a legal conclusion without factual support that relates to Tuskegee University's generalized motives at no particular point in time. Accordingly, the sworn statement that Tuskegee University discriminated on the basis of ethnicity is not substantial evidence to create a dispute of material fact or to contradict the affidavit of Barbara Chisolm or the other substantial evidence in the record. *See Douglas Energy Relief Ass'n v. City of Douglas, Ga.,* 556 Fed. Appx. 820, 825 (11th Cir. Feb. 20, 2014) ("Edward Freeman's affidavit draws the legal conclusion that the City 'gives preferential treatment to Caucasians and discriminates against African Americans who are similarly situated' through inflated electric bills. But, as noted above, the Court does not accept legal conclusions

allowed to receive their refunds on-the-spot in the Bursar's office and (2) in fact, Chisolm

gave EL-Bey *more beneficial* treatment than that extended to other students by personally

requesting the expedited disbursement of his refund and by personally hand-delivering a

refund check the day after the refund posted to his account.  (Doc. 49-2 p. 2 ¶¶ 5-6, 17).

Other students receive their refunds by mail or direct deposit from the accounts payable

department within 14 days after the refund registers on their account.  (Doc. 49-2 p. 2 ¶¶ 5-

6).  Chisolm called the police because EL-Bey would not leave the office just as she would

have done for "any other student . . . in a similar situation," and not because of his race.

(Doc. 49-2 p. 2 ¶¶ 9, 16-17). *Cf. Lopez*, 676 F.3d at 1235 ("Because [the plaintiff] was able

to make his desired purchase from [the retail store], on the same terms available to any other

customer, [the cashier's] discriminatory conduct did not impair [the plaintiff]'s right to make

contracts under § 1981.").

 The *defendant's* racially discriminatory animus determines liability under § 1981.

*Kinnon v. Arcoub, Gopman & Assocs, Inc.*, 490 F.3d 886, 891 (11th Cir. 2007).  Thus, EL-

Bey cannot subjectively impart liability to Tuskegee University by his own unilateral appeal

---

unsupported by the facts."); *Evers v. General Motors Corp.*, 770 F.2d 984,  986 (11th Cir. 1985) (holding that "conclusory allegations without specific supporting facts have no probative value" in a response to a motion for summary judgment).

 Further, although EL-Bey attempts to contradict Chisolm's affidavit in an unsigned, unsworn, untimely submission (Doc. 54), the court cannot consider that submission as evidence for purposes of the motion for summary judgment because it is not a sworn statement. Fed. R. Civ. P 56(c); *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007); (Doc. 28 (advising the plaintiff that "[a] party opposing a motion for summary judgment cannot rely only on the unsworn pleadings but must oppose the motion by citing to evidentiary material in the record as provided by Rule 56(c) or by filing sworn affidavits in accordance with Rule 56(c)(4). . . Failure to support assertions about facts or failure to file sworn affidavits may result in this court accepting the moving party's evidence as the truth.")).

to his race or ethnicity.  Even if EL-Bey subjectively believed he had a right to refuse non-discriminatory instructions to leave the office or to resist the subsequent arrest because he considers himself to be a "Moor" whose ethnicity grants him some sort of sovereign or immune status (Doc. 37), EL-Bey's appeal to his own claimed ethnicity still would not create liability under § 1981.  Section 1981 does not entitle members of any real or perceived race or ethnicity, including "Moors" and self-proclaimed sovereign citizens, to receive *special* rights or to be excused from following rules that are applicable to everyone else.  On the contrary, it guarantees "[a]ll persons within the jurisdiction of the United States" of all races and ethnicities "the *same* right[s] . . . to make enforce contracts . . . and to the full and *equal* benefit of all laws and proceedings for the security of persons and property."  42 U.S.C. § 1981(a) (emphasis added).

Accordingly, even if EL-Bey's financial aid refund was somehow a contractual matter, Tuskegee University cannot be liable under § 1981 because it afforded EL-Bey the same (or more preferential) access to the refund as it affords to all students regardless of race or ethnicity.  42 U.S.C. § 1981(a) ("All persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens");.  *Lopez*, 676 F.3d at 1235 ("[Section] 1981 is not a general civility code" and applies only where the plaintiff was "denied the right to make, enforce, or terminate a contract" on the basis of race or ethnicity); *Kinnon*, 490 F.3d at 891 (holding that, to establish a claim under § 1981, the plaintiff must submit evidence that the defendant intended to discriminate on the basis of race).  Therefore, Tuskegee University

is entitled to summary judgment on EL-Bey's § 1981 claim arising out of the incident in the Bursar's office, and that claim is due to be dismissed with prejudice.

**B.     42 U.S.C. § 1983: False Arrest and Excessive Force**

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The court construes EL-Bey's allegations regarding the June 13, 2013 arrest as a claim for relief pursuant to 42 U.S.C. § 1983 alleging that Tuskegee University campus police arrested him without probable cause and with excessive force.

**1.     Under Color of Law**

"Under the terms of [§ 1983] '"[e]very person" who acts under color of state law to deprive another of a constitutional right [is] answerable to that person in a suit for damages.'" *Rehberg v. Paulk*, 132 S.Ct. 1497, 1501-02 (2012) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976) (quoting 42 U.S.C. § 1983)).  Tuskegee University argues that it could not have been acting under color of state law because it is a private university and, therefore, unlike a public university, it is not an arm of the State of Alabama.  (Doc. 48 pp. 21-24).  In support of this argument, Tuskegee University cites *Knight v. State of Alabama*, 900 F. Supp. 272, 334 (N.D. Ala. 1995) which states: "Tuskegee is a private institution, and the state of

Alabama has no obligation to provide any particular funds to it."[7]

However, the mere fact that an institution or corporation is a private entity does not, in all cases, necessarily mean that the entity is incapable of acting "under color of state law." Although § 1983 "excludes from its reach merely private conduct, no matter how discriminatory or wrongful," *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999), a private party can act "under color of state law" where, for instance, the private party is

---

[7]However,  Ala. Code 1975 § 16-57-5, which was adopted in 2002 (several years after *Knight* was decided), and which Tuskegee University has not addressed, provides:

> The Legislature finds that Tuskegee University has a unique relationship to the State of Alabama. The Legislature further finds that due to the unique nature of the circumstances related to the establishment and development of Tuskegee Institute which differs from that of private schools and colleges receiving funds from the state and from the state's public colleges and universities, the institution should be afforded a unique treatment relative to funding from the Education Trust Fund. Tuskegee Institute was established by an act of the Legislature in 1881 and separately incorporated by an act of the Legislature in 1892; the Governor appoints five commissioners who serve as voting members on the Tuskegee Board; and the State Superintendent of Education serves as an ex officio voting commissioner on the Tuskegee Board. Tuskegee has received appropriations from the Legislature since 1881. *Being a private institution as well as a state related and supported institution* [sic], the Legislature deems that Tuskegee University should be funded accordingly and not as the private schools and colleges nor as the state public colleges and universities are funded.

Ala. Code 1975 § 16-57-5 (emphasis added).  *See also In re Honorable Myron Penn*, Ala. Op. Atty. Gen. No. 2003-243 (Sept. 18, 2003) ("Given the unique legislative history of Tuskegee University, it is neither solely a private university nor strictly a public university. . . . Tuskegee University uniquely is both a private and a state-related institution. The Legislature has determined that this University should be funded by an annual appropriation, but not as the private schools and colleges nor as the state public colleges and universities." (citing Ala. Code 1975 § 16-57-5)).

Thus, the court doubts whether, *Knight*, 900 F. Supp. 272, which is not controlling authority, resolves the question of whether Tuskegee University is a private entity and not an arm of the state for *all* intents and purposes.  If, in the context of this case, Tuskegee University is wrong about its status as a private entity and is, in fact, a state entity, it is nevertheless entitled to summary judgement on grounds of sovereign immunity and because it is not a "person" subject to liability under § 1983. *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995); *Harden v. Adams*, 760 F.2d 1158, 1163-64 (11th Cir. 1985); *Rigby v. Auburn Univ.*, 448 So. 2d 345, 347 (Ala. 1984).

performing a "public function" that is "'traditionally the exclusive prerogative of the state.'"
*Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1277 (11th Cir.
2003) (quoting *Willis v. Univ. Health Servs., Inc.*, 993 F.2d 837, 840 (11th Cir.1993)).

In this case, EL-Bey challenges his arrest by Tuskegee University police officers who,
although appointed to their posts and employed by Tuskegee University, are "peace officer[s]
whose authority extend[s] to any place in the state," Ala. Code 1975 § 16-47-1, and are
"charged with all the duties and invested with all the powers of police officers." Ala. Code
1975 § 16-22-1; *see also In re Hon. Bobby Humphryes*, Ala. Op. Atty. Gen. No. 2002-215
("Police officers employed by institutions of higher learning in the State of Alabama are
certified by the Alabama Peace Officers' Standards and Training Commission and have full
authority to carry out enforcement of the laws of Alabama on a campus and throughout the
state."). Nothing could be *more* representative of "the traditional definition of acting under
color of state law," which "requires that the defendant in a [section] 1983 action have
exercised power 'possessed by virtue of state law and made possible only because the
[defendant] is clothed with the authority of state law.'" *Myers v. Bowman*, 713 F.3d 1319,
1329-30 (11th Cir. 2013) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)).

Thus, the campus police were not acting as merely private individuals when they
arrested EL-Bey. *Griffin v. State of Md.* 378 U.S. 130, 135 (1964) ("If an individual is
possessed of state authority and purports to act under that authority, his action is state
action."). *Cf. White v. Scrivner Corp.*, 594 F.2d 140, 142 (5th Cir. 1979) (holding that private

security personnel with no law enforcement authority were not acting under the color of state law when they searched and detaining shoplifters and then called the police); *see also Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).

Rather, the campus police arrested EL-Bey under color of state law because they were performing a public function that is traditionally the exclusive prerogative of the state (police protection) while exercising statutorily-granted state law-enforcement authority that is not granted to private citizens. *Griffin*, 378 U.S. 130, 135 (holding that where a security guard at a privately-owned park "was subject to the control and direction" of his private employer but had been deputized as a sheriff and wore the badge and uniform of a deputy sheriff, the guard acted under color of state law when, while "purport[ing] to exercise the authority of a deputy sheriff," he arrested the petitioners for trespassing after they refused his and his and his private employer's instructions to leave the premises); *Myers*, 713 F.3d at 1330 (holding that a person acts under color of state law when "'the manner of his conduct ... makes clear that he was asserting the authority granted him [by the state] and not acting in the role of a private person'" (quoting *Williams v. United States*, 341 U.S. 97, 100 (1951)); *Henderson v. Fisher*, 631 F.2d 1115, 1118 (3rd Cir. 1980) (holding that, when carrying out an arrest, campus police exercised a function that was traditionally the exclusive prerogative of the state and that "the [statutory] delegation of police powers, a government function, to the campus police buttresses the conclusion that the campus police act under color of state

19

authority"); *see Foley v. Connelie*, 435 U.S. 291, 297 (1978) ("[T]he police function fulfills a most fundamental obligation of government to its constituency. . . . An arrest [is] the function most commonly associated with the police[.]").

## 2.    Tuskegee's § 1983 Liability For Campus Police Officers' Acts

"[T]he language of § 1983 . . . require[s] that liability attaches only to those actors who violate a plaintiff's rights." *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997).  Thus, a corporation may not be held liable for the acts of its employees under a theory of *respondeat superior. Id.*; *Howell v. Evans*, 922 F.2d 712 (11th Cir. 1991).  However, when a private entity performs a function traditionally within the exclusive prerogative of the state, the entity may be held liable under § 1983 when the entity itself has a policy or custom that, when executed by its agents or employees, deprives a person of his constitutional rights. *Buckner*, 116 F.3d at 452.  As explained in Section IV.B.1. of this Recommendation, Tuskegee University's campus police officers were performing a function that is traditionally the prerogative of the state.

The court notes that the alleged acts of Chisolm and Hill in summoning the police or in requesting that EL-Bey be arrested were *not* actions taken "under color of state law" or in performance of a function traditionally within the exclusive prerogative of the state.  *White*, 594 F.2d at 140; *Williams v. Town of White Hall, Ala.*, 450 F. Supp. 2d 1300, 1308 (M.D. Ala. 2006) ("When a security situation arises, private businesses that call the police do not transform themselves into state actors. . . . It is undeniable that if a private business wishes

to eject a rowdy customer and the customer refuses to leave, the police may be called to remove that person by force."). However, EL-Bey contends that Tuskegee University (and Acting Provost Walter Hill in particular) had an institutional policy or custom of persecuting him for his "ethic identity and religious affiliation either real or perceived" as a follower of the Moorish religion. (Doc. 40; Doc. 52; *see also* Doc. 1). Thus, when the complaint is liberally construed, EL-Bey appears to contend that Tuskegee University administrators Chisolm and Hill instructed the campus police to subject him to false arrest and excessive force as a means of executing the university's policy of targeting and punishing him for his Moorish religion. *See Buckner*, 116 F.3d at 452 (holding that a private entity carrying out a traditional function may be liable under § 1983 when unconstitutional action of its employees executes a "'policy or custom . . . made by . . . those whose edicts or acts may fairly be said to represent official policy'" of the entity (quoting *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978)).

Accordingly, the court will construe EL-Bey's complaint as alleging that Tuskegee University is liable for the acts of its campus police officers because, in allegedly targeting him for false arrest and subjecting to excessive force under color of state law, the officers were executing the university's policy of targeting and punishing him for his Moorish religion.

**3.    False Arrest**

The existence of probable cause is an absolute bar to a § 1983 action for false arrest.

21

*Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996).  "Probable cause exists when 'the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Wilkerson v. Seymour*, 736 F.3d 974, 978 (11th Cir. 2013) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)).  Under Alabama law, a person commits the offense of trespass in the third degree when he "knowingly enters or remains unlawfully in or upon premises." Ala. Code 1975 § 13A-7-4.  A person who lawfully enters premises that are generally open to the public "knowingly . . . remains unlawfully" on the premises when he refuses a lawful request to leave the premises.  *See Satterwhite v. City of Auburn*, 945 So. 2d 1076, 1079 (Ala. Crim. App. 2006) (holding that the defendant committed the offense of criminal trespass in the third degree in a bookstore when she "refused to leave the . . . store after being asked to leave by [store] management" and city police).

The uncontradicted evidence demonstrates that Chisolm called campus police after she instructed EL-Bey to leave the Bursar's office "several times" and he refused to leave. (Doc. 49-2 p. 2 ¶¶ 8-9).  At least three times, the campus police also asked EL-Bey to leave, and he refused.  (Doc. 49-2 p. 2 ¶¶ 10-12).  Then the campus police arrested EL-Bey.  (Doc. 49-2 p. 2 ¶ 13).  Because EL-Bey refused the lawful instructions of Chisolm and the Tuskegee University police officers to leave the premises, there can be no dispute that the police had more than sufficient information to reasonably conclude that he was in the process

of committing the offense of criminal trespass and, therefore, they had probable cause to make an arrest. *See Satterwhite*, 945 So. 2d at 1090 ("The evidence indicated that [the defendant] did not leave [the bookstore] after being informed that she would not be allowed to remain in the store . . . and she was asked to leave by both a [bookstore] manager and [an Auburn city police officer]. This evidence was sufficient to warrant submitting the case to the jury."); *see also Ortega*, 85 F.3d at 1525 (11th Cir. 1996) ("Probable cause to arrest exists if the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed or is committing an offense." (citing *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990)).

EL-Bey argues that he was never charged with criminal trespass. The fact that criminal trespass charges were not filed does not retroactively negate the existence of probable cause at the time of the arrest. *See Baker v. McCollan*, 443 U.S. 137, 145 (1979) (holding that § 1983 does not provide a cause of action for every suspect who is arrested and then released, even if the suspect was innocent); *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004) ("The existence of probable cause *at the time of arrest* . . . constitutes an absolute bar to a section 1983 action for false arrest." (emphasis added)); *Marx*, 905 F.2d at 1507 ("That a defendant is subsequently acquitted or charges are dropped against the defendant is of no consequence in determining the validity of the arrest itself.").

EL-Bey has filed a document titled "Lawful Notice and Declaration of Status" which

states:

> We the FREE Moabites stand for the [Moorish Indigenous Republic] and are sovereign (self-governed) by and ONLY Obligated to The laws of the Republic, and its GREAT SEAL and the principles and standards embodied in the MOORISH NATIONAL FLAG . . . WE THE FREE MOABITES THE ONLY TRUE NATIONALS maintain a NON-OBLIGATORY respect for the Union Rights Republic (U.S.A.), its members, laws, ordinances, codes, customs, and tradition, pursuant to . . . [the] MOROCCAN TREATY OF SEVENTEEN-EIGHTY SEVEN (1787).

(Doc. 37 pp. 1-2) (sic).

The view that, by virtue of one's nonwhite ancestry, one is a Moorish national and needs to obey "only those laws mentioned in an ancient treaty between the United States and Morocco" is a view "espoused by many adherents to the Moorish Science Temple," a heterodox black Islamic sect which was founded in 1913 by prophet Noble Drew Ali. *United States v. James*, 328 F.3d 953, 954 (7th Cir. 2003). Thus, EL-Bey appears[8] to argue that any request or instruction to leave the Bursar's office was an unlawful request because he is an indigenous "Moor" or "Moabite" and a sovereign citizen; therefore, he believes he was within his rights to refuse Chisolm's and the police officers' requests to leave the Bursar's office.

Nothing in the Treaty of Peace and Friendship  or in any other document, statute, or

---

[8]It is evident from the "Lawful Notice and Declaration of Status" that the self-proclaimed "Moors" also consider themselves to be free not only from the laws of the United States, but also from the conventional rules of standard English usage, grammar, punctuation, and capitalization, thereby obfuscating the meaning of the document.  In light of EL-Bey's *pro se* status, the court has liberally interpreted the document as an assertion of special legal status or immunity.  *See Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) ("A document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

treaty cited by EL-Bey supports his position that his self-proclaimed Moorish, Moabite, or Moroccan heritage legally alters his citizenship or nationality or excuses him from complying with the laws of Alabama or the United States. *See* http://avalon.law.yale.edu/18th_century/bar1786t.asp (electronically-accessible copy of the Treaty of Peace and Friendship); 158 Cong. Rec. S5727-01, 2012 WL 3100992 (July 31, 2012) (explaining the purpose, history, legal significance, and importance of the Treaty of Peace and Friendship between the United States and the Kingdom of Morocco); *see also Jones-Bey v. Ala.*, Slip Copy, 2014 WL 1233826 at *3 (N.D. Ala. 2014) (recommendation of the magistrate judge, adopted Mar. 25, 2014) ("The fact that a group claiming to be 'Moorish Americans' has written documents that might support th[e] idea" that one's status as a Moorish-American immunizes him from prosecution under Alabama law "does not establish a valid claim."); *Bey v. Calverton Park Police*, 2012 WL 3637854, at * 1 (E.D. Mo. Aug. 23, 2012) ("Fatal to petitioner's assertion of immunity is the non-recognition of the Moorish Nation as a sovereign state by the United States.  Petitioner cannot unilaterally bestow sovereign immunity upon himself." (citations omitted)); *Khattab El v. United states Justice Dep't*,  1988 WL 5117, at * 2 (E.D. Pa. 1988) (holding that the "plaintiff cannot assert unilaterally diplomatic immunity" on the basis of his status as a "Moorish-American," nor can he be imbued with "sovereign immunity" as an alleged agent of the Moorish nation because "the United States has not recognized the sovereignty of the Moorish Nation").

There is absolutely no reasonable legal basis for the proposition that a person who has

renounced his citizenship,[9] an alien, an indigenous person, a self-proclaimed sovereign citizen, or even a "Moorish-American" is exempt from Alabama law simply because he is not (or does not consider himself to be) an ordinary citizen of the State of Alabama.  EL-Bey must obey Alabama law so long as he remains in Alabama even if he is not a United States or Alabama citizen and even if he is a member of the "Nation of Aboriginal Indigenous Peoples" who refer to themselves by a number of names including "The Moorish Indigenous Republic," the "Moabites of Al p," or "Free Moorish Nationals." (Doc. 37).  *Carlisle v. United States*,  83 U.S. 147, 155 (1872) ("Every foreigner born residing in a country owes to that country allegiance and obedience to its laws so long as he remains in it, as a duty upon him by the mere fact of his residence, and that temporary protection which he enjoys, and is as much bound to obey its laws as native subjects or citizens. This is the universal understanding in all civilized states, and nowhere a more established doctrine than in this country." (citation and internal quotation marks omitted)); *Linge v. State of Georgia Inc.*, 569 Fed. Appx. 895, 896 (11th Cir. June 24, 2014) ("[T]o the extent that [the plaintiff] . . . argues that" state court criminal proceedings should be nullified because "he is a sovereign citizen and is not subject to the jurisdiction of Georgia state courts or Georgia laws, both we and the district court lack jurisdiction to consider his claim because it is 'wholly insubstantial and frivolous.'"); *United States v. James*, 328 F.3d 953, 954 (7th Cir. 2003) ("Laws of the United

---

[9]Despite his claims that he is a national of the Moorish Indigenous Republic, EL-Bey has not offered proof to establish he has voluntarily relinquished or renounced his United States citizenship pursuant to 8 U.S.C. § 1481(a)(5).

States apply to all persons within its borders. Even if [the self-proclaimed "Moor" was] not a citizen of the United States (though he is, having been born here), he would be obliged to respect the laws of this nation."); *Hellenic Lines Ltd. v. Rhoditis*, 412 F.2d 919, 925 (5th Cir. 1969) ("[T]he duties and obligations of a resident alien have not been thought to 'differ materially from those of native-born or naturalized citizens.'" (quoting *Leonhard v. Eley*, 151 F.2d 409, 410 (10th Cir. 1945)); *Jones-Bey*, 2014 WL 1233826 at *3 ("Reduced to its essence, petitioner's claim is that he is a 'Moorish American' and that, based on his ancestry, the State of Alabama did not have jurisdiction to prosecute and imprison him for committing a crime. There is no basis in the law for such a claim.")[10]

Accordingly, EL-Bey is thoroughly mistaken in his belief that, by law, his self-proclaimed status as "Moor" and a sovereign citizen immunizes him from arrest, exempts him from complying with Alabama law, or excuses him from complying with Chisolm's or the campus police officers' lawful requests to leave the Bursar's office.  Further, no matter

---

[10]This court's research confirms that hundreds of state and federal court cases across the nation have involved claims that a person's status as a Moorish-American exempts him or her from arrest, prosecution, or imprisonment for crimes under state or federal law, or otherwise confers unique legal status, rights, or privileges on the "Moorish-American" individual.  The court has not found one case where such a claim has succeeded.  *See, e.g., Hill v. South Carolina*, 2011 WL 6982255, at *3 (D.S.C. 2011) (recommendation of the magistrate judge, adopted January 11, 2012) ("Each of Petitioner's grounds for relief are based on the premise that he should not have been prosecuted for violating the criminal laws of South Carolina because he is an indigenous aboriginal Moorish citizen. This assertion appears to be factually frivolous on its face."); *Caldwell v. Wood*, 2010 WL 5441670, 17 (W.D.N.C. 2010) ("The suggestion that Petitioner is entitled to ignore the laws of the State of North Carolina by claiming membership in the 'Moorish-American' nation is ludicrous."); *Allah El v. Dist. Att'y for Bronx County*, No. 09 Civ. 8746, 2009 WL 3756331, at *1 (S.D.N.Y. 2009) ("Petitioner's purported status as a Moorish-American citizen does not enable him to violate state and federal laws," including laws against criminal trespass, "without consequence"); *Khattab El*, 1988 WL 5117, at * 2 (E.D. Pa. 1988) ("Even assuming, arguendo, that plaintiff is a naturalized Moorish citizen as he alleges, he is an alien under United States law. . . . Aliens must obey the laws of the United States . . . . While residing in the United States, plaintiff had a duty to conform to the laws of this country.").

how sincerely EL-Bey may hold his personal religious beliefs, his mistake of law regarding the legal implications of his status as a "Moorish-American" does not negate the existence of probable cause for the arrest.  A person "knowingly . . . remains unlawfully on the premises" in violation of Ala. Code 1975 § 13A-7-4 even if the person honestly but incorrectly believes that the lawful request to leave was an unlawful one, or that he or she has a legal right or privilege to refuse the request. Ala. Code 1975 § 13A-2-6(b) ("A person is not relieved of criminal liability for conduct because he engages in that conduct under a mistaken belief that it does not, as a matter of law, constitute an offense ."); *Allison v. City of Birmingham*, 580 So. 2d 1377, 1384-85 (Ala. Cr. App. 1991) (holding that the element of "knowingly" remaining on premises unlawfully was not negated by abortion clinic protesters' mistake of fact or law in honestly but mistakenly and unreasonably believing that they had a legal defense to trespassing charges and could refuse any request to leave the abortion clinic on grounds that they were acting in defense of others); *see Satterwhite*, 945 So. 2d at 1090 (holding that the defendant committed the defense of criminal trespass even though, at the time of the violation, she incorrectly believed that the request to leave the store was itself an unlawful violation of the Americans with Disabilities Act).

Thus, despite EL-Bey's appeals to his religious belief that he is a Moorish-American, he was not subjected to false arrest because the police had probable cause to make the arrest. *Ortega*, 85 F.3d at 1525 (holding that probable cause is an absolute bar to a § 1983 action for false arrest.). Therefore, Tuskegee University's alleged policy of targeting EL-Bey for his

28

Moorish religion does not provide an actionable basis for his § 1983 claim for false arrest because that policy did not deprive him of his constitutional rights. *See Buckner*, 116 F.3d at 452 (holding private entity may be subject to § 1983 liability when execution of the entity's policies by its employees "violate[s] a plaintiff's rights"). Accordingly, Tuskegee University is entitled to summary judgment on EL-Bey's § 1983 claim for false arrest.

**4. Excessive Force**

More than once, EL-Bey has been instructed that, to state a claim against Tuskegee University, he must describe with reasonable particularity the nature of the allegedly unconstitutional actions that Defendant Tuskegee University took toward him on June 18, 2013. (Doc. 6; Doc. 30). He has been given an opportunity to amend his complaint to do so. (Doc. 30). His amended complaint states that, during the arrest in the Bursar's office ,the campus police "did grab and forcefully lift Mr. EL-Bey from a seated position and slam him to the ground and apply handcuffs upon Mr. EL-Bey." (Doc. 40 p. 3 ¶ 1). Because the court must construe the complaint liberally in light of EL-Bey's *pro se* status, *Erickson*, 551 U.S. at 93-94, the court has considered whether EL-Bey has stated a claim for excessive force.

"Where, as here, the [§ 1983] excessive force claim arises in the context of an arrest . . . of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989) (quoting U.S. Const. Amend IV). However, not every application of force or physical

coercion during an arrest gives rise to a § 1983 claim for excessive force.  The Supreme Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham*, 490 U.S. 386 at 396.

Thus, the Fourth Amendment does not protect against the use of force during an arrest, but against the unreasonable use of excessive force.  *Graham*, 490 U.S. at 394. Whether the force used to effectuate a particular arrest was reasonable under the Fourth Amendment requires the court to objectively determine "whether a reasonable officer would believe that th[e] level of force is necessary in the situation at hand."  *Lee v. Ferraro,* 284 F.3d 1188, 1197 & n.7 (11th Cir. 2002) (quotation marks and citation omitted).  The factors relevant to that determination are the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, whether he is actively resisting arrest, the need for the application of force, the relationship between the need and the amount of force used, and the extent (if any) of injury inflicted on the arrestee.  *Id.* at 1197-98.

As a matter of law, the allegations that EL-Bey was "grabbed," "forcefully lifted," and "placed in handcuffs" are not sufficient to state a § 1983 claim for excessive use of force. Although third degree criminal trespass is a violation and not a felony, Ala. Code 1975 § 13A-7-4(b), "[f]or even minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls" or floors. *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 740 (11th Cir. 2010). Moreover, the  evidence establishes that EL-Bey would not comply

30

with the verbal requests of the police to leave the Bursar's office on his own volition; therefore, they "attempted to remove him from the office," but he "strongly resisted." (Doc. 49-2 p. 2 ¶¶ 13-14). He himself alleges that he was sitting in a chair "under color of authority" when the officers "did grab and forcefully lift [him] from a seated position and apply handcuffs." (Doc. 40 p. 3 ¶ 1). Therefore, in this case, there can be no dispute that, to effectuate the arrest of the uncooperative EL-Bey, the police absolutely needed to physically "grab" EL-Bey, "forcefully lift" him from his chair, and "apply handcuffs," and it was entirely reasonable for them to do these things. (Doc. 40 p. 3 ¶ 1). *See Brown*, 608 F.3d at 740 ("[P]ulling [an arrestee] out of the car" was "a permissible use of force in effecting an arrest").

Moreover, the allegation that EL-Bey was "slam[med] to the ground" during the arrest is not sufficient to state a claim for excessive force, particularly in light of his active resistance and the lack of any allegation that being "slammed" to the floor endangered or injured him. *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000) ("[T]he application of *de minimis* force, without more, will not support a claim of excessive force."); *Brown*, 608 F.3d at 740 (noting that it was "no constitutional violation to slam plaintiff against wall, kick plaintiff's legs apart, and require plaintiff to raise arms above his head" (citing *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997)). Further, the court notes that all application of force ceased once the resistant EL-Bey was securely arrested. *See Lee*, 284 F.3d at 1197 (holding that, in determining the reasonableness of the application of force, the

court should consider whether the force was applied before the arrestee was fully secured and before any potential risk of escape was vitiated).

Accordingly, there is no factual or legal basis for EL-Bey's allegation that the campus police used excessive force in arresting him. Therefore, Tuskegee University's alleged policy of targeting EL-Bey for his Moorish religion cannot provide an actionable basis for his § 1983 excessive force claim because that policy did not deprive him of any constitutional rights. *See Buckner*, 116 F.3d at 453 (holding that a private entity's §1983 liability is "restricted . . . to instances" where the entity itself "actually cause the deprivation of rights"). Therefore, the court concludes that Tuskegee University is entitled to summary judgment on EL-Bey's §1983 claim for excessive force.

## C.   42 U.S.C. §§ 1983 and 1985 Conspiracy claims

## 1.   Arrest in the Bursar's office

EL-Bey cites 42 U.S.C. § 1985 and § 1983 in his amended complaint, and the court construes the amended complaint as asserting a conspiracy claim against Tuskegee University under § 1985 and § 1983.  *See* 42 U.S.C. § 1985(3) (creating a private right of action against those who conspire to deprive either directly or indirectly "any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws"); *Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir. 2008) (holding that, to prevail on a conspiracy claim under § 1983, the plaintiff must show that the defendants reached an understanding to deprive him of constitutional rights and that his constitutional

rights were actually violated as a result of the conspiracy).

However, all of the participants in the alleged conspiracy to have EL-Bey arrested (Chisolm, Walter Hill, and Tuskegee Police Officers) were Tuskegee University employees, and Defendant Tuskegee University cannot conspire with itself. Ala. Code 1975 § 16-22-1 (providing that the Tuskegee University campus police officers are appointed and employed by the university president or chief executive); *Am. Fed'n of Labor & Congress of Indus. Orgs. v. City of Miami, Fla.*, 637 F.3d 1178, 1191 (11th Cir. 2011) ("To prevail on a § 1983 conspiracy claim a plaintiff must show that an agreement between two or more people (at least one of whom is a state actor)."); *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1261-62 (11th Cir. 2010) (holding that the plaintiffs' § 1983 conspiracy claims were barred by the intracorporate conspiracy doctrine, which " holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy"); *Farese v. Scherer*, 342 F.3d 1223, 1232 (11th Cir. 2003) (holding that, to be actionable under § 1985(3), a conspiracy "requires conduct by more than one actor"); *Dickerson v. Alachua Cnty. Comm'n*, 200 F.3d 761, 767-68 (11th Cir. 2000) (concluding that a § 1985(3) conspiracy claim was barred by the intracorporate conspiracy doctrine on grounds that "it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself, just as it is not possible for an individual person to conspire with himself"); *Chambliss v. Foote*, 562 F.2d 1015 (5th Cir. 1977) (affirming on the basis of the district court's opinion, 21 F.Supp. 12 (E.D. La.), which

granted summary judgment on a § 1985(3) claim on grounds that a "university and its officials are considered as constituting a single legal entity which cannot conspire with itself").

Furthermore, § 1985(3) does not apply "to all tortious, conspiratorial interferences with the rights of others." *Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971). The statutory language in § 1985(3) "requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id*. at 102. Further, "[t]o sustain a conspiracy action under [section] 1983[,] a plaintiff must show an underlying actual denial of his constitutional rights." *Hadley*, 526 F.3d at 1332. EL-Bey was not deprived of equal protection or any other constitutional right and he was not subjected to any form of class-based animus when he was arrested in the bursar's office. Rather, as discussed in Sections IV. A.&B. of this Recommendation, he was arrested for the valid, nondiscriminatory reason that the police had probable cause to arrest him for criminal trespass after he refused to comply with lawful, nondiscriminatory instructions to leave the bursar's office, and he was not subjected to excessive force. Because EL-Bey was not deprived of his constitutional rights, no actionable conspiracy exists under which Tuskegee University may be held liable pursuant to §§ 1983 or 1985(3). *See Buckner*, 116 F.3d at 452 (holding that, under § 1983, liability attaches to private entities acting under color of state law only where the entity "actually caused the alleged deprivation of rights").

34

Accordingly, Tuskegee University is entitled to summary judgment on EL-Bey's §

1983 and § 1985 conspiracy claims arising from the arrest in the Bursar's office, and those

claims are due to be dismissed with prejudice.

## 2.    Conspiracy to Place an Alert on EL-Bey's Automobile

EL-Bey alleges that, on October 23, 2013,[11] "Tuskegee University's Peter Spears and

Walter Hill did conspire with the Alabama Law Enforcement Tactical System (LETS) and

Alabama Bureau of Investigation to initiate an alert on Mr. EL-Bey and his automobile."

(Doc. 40 p. 3 ¶ 4).

Even if such a "conspiracy" existed, EL-Bey has alleged no facts from which it could

reasonably be inferred that the conspiracy was motivated by invidious, class-based intent to

violate his constitutional rights, including his right to equal protection of the law.  *Griffin v.

Breckenridge*, 403 U.S. 88, 101–02 (1971) (holding that, for a conspiracy claim to be

actionable under § 1985(3), "there must be some racial, or perhaps otherwise class-based,

invidiously discriminatory animus behind the conspirators' action" to deprive the plaintiff

of "the equal enjoyment of rights secured by the law to all"); *Am. Fed'n of Labor*, 637 F.3d

at 1191 ("To prevail on a § 1983 conspiracy claim a plaintiff must show . . . an agreement

between two or more people (at least one of whom is a state actor) to violate his

constitutional rights.").

---

[11] The amended complaint states that the alleged conspiracy to place an alert on EL-Bey's automobile occurred on October 23, 2014; however, the court construes this as a typographical error, as the amended complaint was filed on August 1, 2014.  (Doc. 40 p. 3 ¶ 4).

Further, the complaint contains no allegation that the placement of an "alert" on EL-Bey's automobile actually deprived him of any constitutional rights. *Am. Fed'n of Labor*, 637 F.3d at 1191 ("To prevail on a § 1983 conspiracy claim a plaintiff must show that an agreement between two or more people (at least one of whom is a state actor) . . . resulted in an actual violation of [his constitutional] rights.").

Accordingly, the court concludes that EL-Bey's claim alleging conspiracy to place an alert on his automobile is due to be dismissed pursuant to 28 U.S.C. §1915(e)(2)(B)(ii) for failure to state a claim upon which relief can be granted.[12]  Further, because EL-Bey has already been given an opportunity to amend his claim to state his claims against Tuskegee University with sufficient particularity, the court concludes that further opportunities to amend would be futile and that the claim should be dismissed with prejudice. *See Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991), *overruled on other grounds by Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 & n.1 (11th Cir. 2002) (holding that "a [*pro se*] plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice.").

**D.   42 U.S.C. § 1983 and 42 U.S.C. § 2000bb-1: Religious Discrimination**

In his complaint, EL-Bey cites 42 U.S.C § 1983 and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq*.  He also makes the following factual allegations:

---

[12]In its summary judgment motion, Tuskegee University does not address EL-Bey's claim for conspiracy to place an alert on his automobile.

> During the time of the complaints set forth and into the present Mr. EL-Bey is a student at Tuskegee University involved in a dispute process over grades and perceived harassment and discrimination by the University and its professors, faculty, and staff due to his physical appearance and religious/spiritual beliefs. On many occasions Mr. EL-Bey was asked if he was a Christian and/or believed in God as if it were an integral part of the academic process.

(Doc. 40 p. 3 ¶ 5).

RFRA provides that "*government* shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except" in certain circumstances. 42 U.S.C.A. § 2000bb-1 (emphasis added). Section 1983 provides a private right of action for deprivation of constitutional rights by "persons" acting "under color of state law." 42 U.S.C.A. § 1983. Unlike campus police, "professors, faculty, and staff" of private universities have no general inherent statutory authority to act under color and authority of state law, and (aside from EL-Bey's contention that Tuskegee is a public university) there is no factual allegation from which to infer that the "professors, faculty, and staff" acted under color of state law in EL-Bey's particular situation. Therefore, if, as Tuskegee University claims, it is a private institution, it cannot be liable for religious discrimination under RFRA and § 1983.

On the other hand, if, as EL-Bey contends, Tuskegee University can be considered a public state institution for purposes of his religious discrimination claim, then it still cannot be liable for his religious discrimination claims. Alabama's public universities are agencies or instrumentalities of the state entitled to sovereign immunity and are not "persons" subject to liability under § 1983. *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir.

1995); *Harden v. Adams*, 760 F.2d 1158, 1163-64 (11th Cir. 1985); *Rigby v. Auburn Univ.*, 448 So. 2d 345, 347 (Ala. 1984).  Further, in *City of Boerne v. Flores*, 521 U.S. 507, 117 (1997), the United States Supreme Court invalidated RFRA as applied to state and local governments because RFRA exceeded Congress's authority under the Fourteenth Amendment.

Accordingly, Tuskegee University is entitled to summary judgment on EL-Bey's religious discrimination claims.

**E.    42 U.S.C. § 2000d: Exclusion from Federally-Assisted Programs**

EL-Bey cites 42 U.S.C. § 2000d in his complaint.  42 U.S.C. § 2000d provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

EL-Bey alleges that he was subjected to student discipline and precluded from fully participating in Tuskegee University's graduate student program because of his religion.[13] (Doc. 40 p. 3 ¶ 5).  EL-Bey's allegations of religious discrimination do not fall under § 2000d, because, by its terms, § 2000d prohibits discrimination on the basis of race, color, or national origin.  Further, as discussed in Section IV A. and B. of this Recommendation, during the incident in the Bursar's office, neither Chisolm nor the campus police interfered

---

[13]In June 2013, EL-Bey had been enrolled for two years in a two-year thesis-track masters degree in Food and Nutrition Sciences, but was not nearing completion of the program and did not have satisfactory grades, some of which he disputed.  (Doc. 49-2 p. 8 ¶ 4).  He has since been transferred to a non-thesis track program because of his lack of academic progress and in resolution of his grade disputes.  (Doc. 49-2 pp. 8-9 ¶¶ 5-6).

with his ability to receive financial aid on the basis of race, color, or national origin. Accordingly, Tuskegee University is entitled to summary judgment on EL-Bey's § 2000d claim that he was subjected to discrimination on the basis of race, color, or national origin.

**F.      18 U.S.C. §§ 1201, 2261A, 2264, 3771: Statutes Concerning Criminal Liability**

In his complaint, EL-Bey cites the following criminal statutes: 18 U.S.C. §§ 1201, 2261A, 2264, and 3771.  None of these criminal statutes creates a private right of action against Tuskegee University. *See Rock v. BAE Systems*, 556 Fed. Appx. 869, 871 (11th Cir. 2014) (holding that 18 U.S.C. §§ 2261A and 2264 do not create a private cause of action); *In re W.R. Huff Asset Mgmt. Co.*, 409 F.3d 555, 564 (2nd Cir. 2005) (holding that 18 U.S.C. § 3771 "does not grant victims any rights against individuals who have not been convicted of a crime"); *Ervin v. Irani*, Slip Copy, 2014 WL 4966909, at *7 (W.D. Wash. Oct. 3, 2014) (dismissing as frivolous a *pro se* civil claim for violating 18 U.S.C. § 1201 on grounds that no private right of action exists under the statute); *Lewen v. Edinboro Univ. of Penn.*, 2011 WL 4527348, at *5 (W.D. Pa. 2011) ("[C]ourts have repeatedly held that [18 U.S.C. §] 3771 does not authorize a private cause of action for damages."); *Giano v. Martino*, 673 F. Supp. 92, 95 (E.D.N.Y. 1987) ("18 U.S.C. § 1201 . . . was never intended to confer rights on the victim of a kidnapping, and does not do so by its language."); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979) ("[T]his Court has rarely implied a private right of action under a criminal statute, and where it has done so there was at least a statutory basis for inferring that a civil cause of action of some sort lay in favor of someone." (citation and

internal quotation marks omitted)).

Accordingly, Tuskegee University is entitled to summary judgment on EL-Bey's claims for alleged violations of 18 U.S.C. §§ 1201, 2261A, 2264, and 3771.

### IV.  Conclusion

Accordingly, it is the **RECOMMENDATION** of the Magistrate Judge

1.     that Tuskegee University's original motion for summary judgment (Doc. 25) be denied as moot;

2.     that Tuskegee University's amended motion for summary judgment (Doc. 47) be granted;

3.     that EL-Bey's claims against Tuskegee University be dismissed with prejudice; and

4.     that Tuskegee University be dismissed from this action.

It is further

**ORDERED** that the parties shall file any objections to the said Recommendation on or before **November 10, 2014.**  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District

Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Secs., Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 27th day of October, 2014.

_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE

41